IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

                          2:24-CR-009-Z-BR-(1)

CHRISTOPHER NEVAREZ,

     Defendant.

## MEMORANDUM OPINION AND ORDER

Defendant Christopher Nevarez ("Nevarez") moves this Court to dismiss a one-count indictment, which charges him with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Nevarez contends that Section 922(g)(1) facially violates the Constitution. Although Supreme Court dicta and Fifth Circuit precedent bless felon-in-possession laws, Nevarez contends that *New York State Pistol & Rifle Association v. Bruen* demands a different result. Under *Bruen*, regulations on Second Amendment rights must have a "historical analogue" to survive judicial scrutiny. But Section 922(g)(1)'s felon firearm ban arguably lacks the historical pedigree required under *Bruen*. Nonetheless, this Court **FINDS** that the historical record supports *Heller*'s felon dicta and this Circuit's pre-*Bruen* precedent, not because Section 922(g)(1) fits a historical analogue of limiting Second Amendment rights, but because Section 922(g)(1) does not implicate the right of "the people" to keep and bear arms at all. And, because Fifth Circuit precedent forecloses Nevarez's facial challenges, the Court **DENIES** his Motion to Dismiss.

## BACKGROUND

On February 14, 2024, a grand jury indicted Nevarez on one count of being a Convicted

Felon in Possession of a Firearm, in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8).

ECF No. 1. Count One of the Indictment provides:

On or about January 8, 2024, in the Amarillo Division of the Northern District of Texas, and elsewhere, **Christopher Nevarez**, defendant, knowing he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess in and affecting interstate and foreign commerce a firearm, to wit: a Smith and Wesson, model SW9VE, 9mm caliber pistol, serial number PBK1812.

*Id.* at 1.

Nevarez then moved to dismiss the Indictment. ECF No. 26. Fifth Circuit precedent

forecloses his motion, as acknowledged by Nevarez. *Id.* at 4–5, 14. Despite acknowledging that

the Fifth Circuit has rejected his constitutional arguments, Nevarez asks this Court to disregard

that precedent and find in his favor. *Id.* Most notably, he insists that the Supreme Court's decision

in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), calls for a different outcome.

*Id.* at 14.

### LEGAL STANDARDS

Federal Rule of Criminal Procedure 12(b)(1) allows a defendant to "raise by pretrial motion

any defense, objection, or request that the court can determine without a trial on the merits."

This rule encompasses motions to dismiss an indictment for failure to state an offense. Fed. R.

Crim. P. 12(b)(3)(B)(v). "As a motion to dismiss an indictment for failure to state an offense is a

challenge to the sufficiency of the indictment," the Court must "take the allegations of the

indictment as true" and must "determine whether an offense has been stated." *United States v. Kay*,

359 F.3d 738, 742 (5th Cir. 2004) (internal marks omitted) (quoting *United States v. Hogue*, 132

F.3d 1087, 1089 (5th Cir. 1998)). "The propriety of granting a motion to dismiss an indictment . . .

2

by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005). "If a question of law is involved, then consideration of the motion is generally proper." *Id.*

## I.   Section 922(g)(1) is facially constitutional.

Nevarez brings a facial challenge to the constitutionality of Section 922(g)(1). A facial challenge is "the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, No. 22-915, 2024 WL 3074728, at *6 (U.S. June 21, 2024).

As acknowledged by Nevarez, the Fifth Circuit has repeatedly foreclosed facial challenges to Section 922(g)(1)'s constitutionality under both the Commerce Clause and the Second Amendment. ECF No. 26 at 4–5, 9–14. However, even if this Court considers the issue anew, a historical inquiry shows that Section 922(g)(1) survives a constitutional challenge. The original meaning of the Second Amendment shows that convicted felons are not among "the people" who hold Second Amendment rights. Therefore, even though the Government fails to offer any historical analogue sufficient to justify a restriction on Second Amendment rights, history and precedent both confirm that Section 922(g)(1) does not implicate the right of "the people" to keep and bear arms.

### A.   Felons do not possess a Second Amendment right.

The Supreme Court's decisions in *Heller* and *Bruen* require a threshold inquiry when interpreting Second Amendment rights. Courts must first determine whether the challenged law implicates the plain text of the Second Amendment. Only then must the Government overcome the law's presumptive unconstitutionality by providing historical analogues. Because Nevarez's

3

felon status excludes him from Second Amendment protections, the Government need not justify Section 922(g)(1) with historical analogues.

### i. *Heller* and *Bruen* require a threshold inquiry.

The right to keep and bear arms, "however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'" *United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012); *see also Rahimi*, 2024 WL 3074728, at \*5 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)) ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). That is — when broken down into its constituent parts — the Second Amendment recognizes that "the people" hold an individual "right" to "keep and bear" "arms" for self-preservation.

A "right" properly understood requires sufficient faculties of reason to exercise. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 706 (6th Cir. 2016) (Batchelder, J., concurring) ("This comports with the Founding-era conception of rights because that which a person recovered when he overcame a serious mental illness was his *reason*, the faculty necessary to exercise his rights."); *see also* C. Seth Smitherman, *Rights for Thee but Not for Mai: As-Applied Constitutional Challenges to 18 U.S.C. § 922(g)(4)*, 25 Tex. Rev. L. & Pol. 515 (2021) (explaining the common-law basis for disarming the mentally ill). The phrase "keep and bear" correlates to firearm possession and "where" covers possession inside and outside the home. *Heller*, 554 U.S. at 635 ("And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 33 (2022) (finding a right to firearm possession outside the home). *Heller* also answered the "what," — the word

"arms" presumptively covers bearable arms that are in common use at the time. 554 U.S. at 582. *Heller* also specificized the "why" — bearing arms in the event of confrontation, *i.e.*, self-defense. *Id.* at 592.

But here, the "who" matters most. As both Parties recognize, the Second Amendment only protects the right of "the people" to keep and bear arms. ECF Nos. 26 at 9; 36 at 2. So far, the Supreme Court treats "the people" as a threshold requirement before interpreting the right to "keep and bear arms." Important here, the preliminary inquiry centers on whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct," and the Court must determine whether the Government has "justif[ied] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In *Heller*, the Court noted that former police officer Dick Heller belonged among "the people" afforded Second Amendment rights. 554 U.S. at 575–76. In *Bruen*, the Court found that all petitioners qualified as law-abiding, responsible citizens afforded Second Amendment rights. 597 U.S. at 15. So too, this Court must decide whether Nevarez and felons generally, enjoy recognition as "the people" protected by the Second Amendment.

### ii. Felons are not among "the people" who hold Second Amendment rights.

History and precedent confirm that the Constitution excludes felons like Nevarez from "the people" who hold Second Amendment rights. The Framers wrote the Constitution with precision, and their use of the phrase "the people" represented more than a rhetorical flourish. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (rejecting the idea that the Framers used "the people" to avoid a rhetorical redundancy). Rather, "the people" connotes a narrower subset of "persons," *i.e.*, members of the "political community." *Heller*, 554 U.S. at 580. The Constitution's

use of "the people" in the First, Second, Fourth, Ninth, Tenth, and Fourteenth Amendments suggests that those rights are held by the same class of people. *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011), *as revised* (June 29, 2011) (citing *Verdugo-Urquidez*, 494 U.S. at 265); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101–02 (3d Cir. 2023) ("[The Constitution] mentions 'the people' twice with respect to voting for Congress, and 'the people' are recognized as having rights to assemble peaceably, to petition the government for redress, and to be protected against unreasonable searches and seizures.").

Because of his felon status, Nevarez belongs to a group who "have historically been stripped of their Second Amendment rights." *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir.), *rev'd on other grounds*, No. 22-915, 2024 WL 3074728 (Jun. 21, 2024). In the Fifth Circuit, "criminal prohibitions on felons (violent or nonviolent) possessing firearms d[o] not violate [the Second Amendment]." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). That's because *Heller* and *Bruen*'s references to "law-abiding, responsible citizens" were shorthand for the Supreme Court's reasoning that felons and the mentally ill fall outside the groups of people who hold Second Amendment rights. *Rahimi*, 61 F.4th at 452, *rev'd on other grounds*, No. 22-915, 2024 WL 3074728 (Jun. 21, 2024); *see also Rahimi*, 2024 WL 3074728, at *10 (reiterating that forbidding felons from firearm possession is "presumptively lawful"). In other words, "'the people' categorically 'excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses.'" *Id.* (citing *Range v. Att'y Gen. United States of Am.*, 53 F.4th 262, 266 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023)).

This modern felon-exclusion principle claims a historical pedigree dating back to the common law. Early Colonial and English societies excluded felons from "the political community" referenced in *Heller* by disenfranchising them.[1] *See United States v. Emerson*, 270 F.3d 203, 227 (5th Cir. 2001) (citing Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].") (alterations in original)). And disenfranchisement from the nation's polity corresponded with firearm ownership too. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) ("So too, some of the colonies disarmed white aliens, who weren't members of the polity.") (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998) (explaining that aliens only held "sundry" civil rights and "typically could not vote, hold public office, or serve on juries" or hold "the right to bear arms" because these "were rights of members of the polity")).

Nevarez makes two points counseling a different result. First, Nevarez argues that excluding him from "the people" who hold Second Amendment rights would necessarily exclude him from other constitutional protections — thus this Court ought not follow that path. ECF No. 26 at 15. But this is a court of law, not equity, and adopting Nevarez's arguments to the contrary would contradict a central element of our Republic's foundation: that "people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some

---

[1] Legal scholars who criticize *Emerson*'s reliance on scholarship supporting felon disarmament often distinguish between voting and firearm ownership as distinct rights. *See, e.g.*, C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 709 (2009) ("The cited discussion in Cooley, however, concerns classes excluded from voting."); *Kanter v. Barr*, 919 F.3d at 464 (Barrett, J., dissenting) ("There is no basis, then, for assuming that a virtue requirement on the right to vote applies equally to the right to keep and bear arms."). But the voting–firearm distinction misses the connective tissue running between the Second Amendment and Article I, § 2's right to vote. *See Verdugo-Urquidez*, 494 U.S. at 265 ("'[T]he people' seems to have been a term of art employed in select parts of the Constitution.").

extratextual consideration." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020). In any event, the Fifth Circuit seems unlikely to adopt Nevarez's feared outcome. *See Portillo-Munoz*, 643 F.3d at 441 (distinguishing between Second and Fourth Amendments on the basis of affirmative and protective rights).

Second, Nevarez contends that "at the very least," he has rejoined the political community and become part of "the people" since Texas extends the right to vote to felons like him. ECF No. 26 at 15. But of course, the Constitution sets floors, not ceilings. That Texas extends rights to felons in one area imposes no obligation for the federal government to extend rights in another. A historical inquiry demonstrates — consistent with Supreme Court precedent — that Nevarez is not among "the people" who hold Second Amendment rights. Accordingly, the Court **FINDS** that Section 922(g)(1) survives a facial challenge because it is constitutional "as applied to the facts of [Nevarez's] own case." *Rahimi*, 2024 WL 3074728, at \*6.

## B. The Government fails to offer historical analogues.

Were Nevarez to hold Second Amendment rights, Section 922(g)(1)'s disability against him would not survive *Bruen*'s history and tradition requirement. Under *Bruen*, courts must find "historical analogues" to uphold restrictions on the Second Amendment. *Bruen*, 597 U.S. at 30. Those analogues must offer more than comparable regulations on the right but must also limit that right for the same reasons. *Id.* at 29; *see also Rahimi*, No. 22-915, 2024 WL 3074728, at \*6 (U.S. June 21, 2024) ("Why and how the regulation burdens the right are central to this inquiry."). Were Section 922(g)(1)'s disability to trigger *Bruen*'s historical analogue requirement, it would fail to meet constitutional muster.

Modern laws banning firearm possession by convicted felons "have no longstanding analogue in our national history and tradition of firearm regulation." *Range*, 69 F.4th at 108 (Porter, J., concurring); *see also Kanter*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting) (recognizing that "scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms"). Federal firearm regulations, in general, "were not commonplace until the beginning of the twentieth century." Kari Lorentson, *18 U.S.C. § 922(g)(1) Under Attack: The Case for As-Applied Challenges to the Felon-in-Possession Ban*, 93 Notre Dame L. Rev. 1723, 1724 (2018). And "only a half-dozen states had adopted even limited felon-disarmament statutes (mostly limited to handgun possession) by 1925." Michael P. O'Shea, *The Concrete Second Amendment: Traditionalist Interpretation and the Right to Keep and Bear Arms*, 26 Tex. Rev. L. & Pol. 103, 128–29 (2021).

Section 922(g)(1)'s felon firearm ban can only trace its roots back to the Federal Firearms Act of 1938. There Congress, "for the first time, criminalized the possession of firearms (that had been shipped in interstate commerce) by individuals who had been convicted of 'crime[s] of violence.'" *Id.* (alterations in original). The Act's findings justified the ban by noting that — under the prior regulatory regime — criminals could acquire firearms with ease, contributing to lawlessness and violent crime in the United States. *Id.* The Act made it "unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to transport or receive any firearm. *Id.* That 1938 prohibition remains in force, codified as 18 U.S.C. Section 922(g)(1), which Nevarez challenges today.

The Government identifies two potential historical analogues: (1) laws authorizing capital punishment and estate forfeiture and (2) laws disarming untrustworthy individuals and allegedly seditious people. ECF No. 36 at 7–14. Neither meets *Bruen*'s requirement.

First, the Government identifies laws from the Founding, which authorize capital punishment and estate forfeiture for convicted felons. *Id.* at 8–11. The Government essentially argues that the greater must include the lesser — laws authorizing capital punishment or forfeiture of all property necessarily also bless disarmament. *Id.* at 11 (citing *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)).

Legal scholars and this Court reject that argument.[2] The Government correctly states that some English criminal laws in the 1700s blessed the confiscation of all property — including weapons. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714–15 (2009). But most of these estate forfeiture laws are not comparable here because they did not amount to a permanent ban on the possession of weapons. *Id.* A felon who forfeited his property could — in most cases — purchase and possess new weapons later. *Id.* And laws that *did* impose a permanent disability on property ownership "did not carry over to the United States in their strict English form." *Id.* In 1803, St. George Tucker observed that the laws recorded by William Blackstone and cited by the Government never applied in the United States. *See id.* at 715 ("[c]onfiscations, forfeitures, and corruption of blood, do not follow in case of conviction or attainder for any treason or felony either in the commonwealth of Virginia, or under the federal government.") (alteration in original) (quoting 5 William Blackstone, COMMENTARIES at 377 n.8

---

[2] *See, e.g.*, *Kanter v. Barr*, 919 F.3d at 462 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.").

(St. George Tucker ed., 1803)). Therefore, the capital punishment and estate forfeiture laws are not "relevantly similar." *Rahimi*, 2024 WL 3074728, at \*9.

The Government next contends that loyalty-based disarmament laws support Section 922(g)(1)'s felon prohibition. ECF No. 36 at 11–14. Among these laws are those "disarming Papists and reputed Papists," "complete bans on gun ownership by slaves and Native Americans," and firearm disabilities against Americans who "shall libel or defame" any acts of the Continental Congress. *Id.* at 12–13. The Court need not decide whether these prohibitions — tainted by impermissible religious, racial, and political discrimination — can ever serve as an appropriate historical analogue.[3] It is enough to find that, although these laws did impose comparable, total bans on firearm possession, they did so for different reasons. While Section 922(g)(1) considered the need to disarm felons over fear of general lawlessness and violence, the laws offered by the Government disarmed individuals over feared disloyalty to the ruling government. However dangerous Nevarez may be, the Government does not allege that he could overthrow our Republic. Accordingly, the laws offered by the Government would not support Section 922(g)(1) as a restriction on Second Amendment rights.

## II. Binding precedent forecloses Nevarez's arguments.

As acknowledged by Nevarez, the Fifth Circuit has repeatedly foreclosed facial challenges to Section 922(g)(1)'s constitutionality under both the Commerce Clause and the Second Amendment. The Supreme Court, thus far, has declined to overturn this area of law. This Court must follow that precedent until the Fifth Circuit or Supreme Court overturns it.

---

[3] They can't. *See Rahimi*, No. 22-915, 2024 WL 3074728, at \*21 (U.S. June 21, 2024) (Kavanaugh, J., concurring) ("But in using pre-ratification history, courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind."); *see also id.* ("Ratified in 1868, [the Equal Protection] Clause sought to reject the Nation's history of racial discrimination, not to backdoor incorporate racially discriminatory and oppressive historical practices and laws into the Constitution.").

## A. Binding precedent forecloses Nevarez's Commerce Clause argument.

Nevarez argues that the "possession" prong of Section 922(g) exceeds both statutory and constitutional authority. ECF No. 26 at 3–9. Specifically, he contends that "possess in or affecting commerce" must mean more than mere gun possession where any constituent part traveled across state lines. *Id.* at 4–5. Nevarez "concedes that courts have thus far rejected" his arguments, but he contends that those courts erred. *Id.*

The Fifth Circuit squarely addressed that assertion in *United States v. Rawls* and found it lacking. 85 F.3d 240, 242–43 (5th Cir. 1996). Interpreting the text of Section 922(g)(1), our Circuit held that "[t]he 'in or affecting commerce' element can be satisfied if the firearm possessed by a convicted felon had previously traveled in interstate commerce." *Id.* at 243 (citing *United States v. Fitzhugh*, 984 F.2d 143, 146 (5th Cir. 1993)). That conclusion relied on the Supreme Court's holding in *Scarborough v. United States*, where the Court interpreted a nearly identical statute to require only the "minimal nexus" that, at some point, the firearm traveled in interstate or foreign commerce. 431 U.S. 563, 575–77 (1977); *see also United States v. Guidry*, 406 F.3d 314, 318 (5th Cir. 2005) ("The interstate commerce element of a [Section] 922(g)(1) charge is satisfied where the government demonstrates that the firearm was manufactured out of state."). This binding precedent forecloses the statutory question here; Nevarez's argument fails.

Nevarez also claims that *United States v. Lopez*, 514 U.S. 549 (1995) — which predated *Rawls* — shows that Section 922(g) exceeds congressional Commerce Clause authority. ECF No. 19 at 3–9. Not so. The *Rawls* court addressed this issue as well, noting that "[c]entral to the Court's holding in *Lopez* was the fact that [the statute at issue] contained 'no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.'" *Rawls*, 85 F.3d at 242 (quoting *Lopez*, 514 U.S. at 561).

But Section 922(g)(1) requires a defendant's possession be "in or affecting commerce." Due to this distinction, the *Rawls* court held that *Lopez* does not constitutionally invalidate Section 922(g)(1). *Id.* at 242–43. Since then, the Fifth Circuit continued upholding the constitutionality of Section 922(g)(1) under the Commerce Clause. *E.g.*, *United States v. Alcantar*, 733 F.3d 143, 145–46 (5th Cir. 2013); *United States v. Schmidt*, 487 F.3d 253, 255 (5th Cir. 2007). This Court must follow that binding precedent.

### B.  Binding precedent upholds Section 922(g)(1)'s facial constitutionality under the Second Amendment.

Nevarez next challenges the facial constitutionality of Section 922(g)(1) under the Second Amendment. ECF No. 19 at 7. Again, he concedes that the Fifth Circuit previously rejected this argument; still, he argues that the Supreme Court's holding in *Bruen* now demands a different outcome. *Id.* at 9–14. As previously discussed, Section 922(g)(1) is constitutional as applied to Nevarez and thus, cannot be facially unconstitutional. But even if that were not so, Fifth Circuit precedent still forecloses Nevarez's facial challenge. The Supreme Court merely clarified the framework governing the interpretation of the Second Amendment in *Bruen*. 597 U.S. at 1.

*Bruen* only changed Second Amendment precedent by swapping the application of means-end scrutiny for an analysis of "text, history, and tradition." *Id.* at 79. But history and tradition only apply where a law implicates the Second Amendment's plain text. *See Bruen*, 597 U.S. at 32 (clarifying that petitioners "are part of 'the people' whom the Second Amendment protects" before turning to historical traditions of firearm regulation).

And Fifth Circuit precedent upholding Section 922(g)(1) did not expressly invoke the means-end scrutiny that *Bruen* rejected. Its analysis more clearly invoked the considerations endorsed by both *Bruen* and Supreme Court precedent before it: "a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19–20 (citing *Heller*, 554 U.S. at 570).

In particular, the Fifth Circuit has repeatedly cited *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), for the proposition that, when considering the Second Amendment as historically understood, Section 922(g)(1) survives constitutional challenges.

In *Emerson*, the Fifth Circuit first determined — based on a lengthy analysis of its text and history — that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms." 270 F.3d at 260. The court clarified, however, that those rights may "be made subject to . . . limited, narrowly tailored specific exceptions or restrictions . . . that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id*. at 261. In particular, the court stated that "it is clear that felons . . . may be prohibited from possessing firearms." *Id*. In support of this conclusion, the court pointed to constitutional scholarship indicating that "Colonial and English societies of the eighteenth century" excluded felons from possessing firearms and that the Founders would not have "considered felons within the common law right to arms or intended to confer any such right upon them." *Id*. at 226 n.21 (citations omitted).

Although the Fifth Circuit later determined that *Emerson* applied means-end scrutiny "sub silentio" as an additional analytical step, *Emerson* did not apply means-end scrutiny when performing its historical analysis. *United States v. McGinnis*, 956 F.3d 747, 755 (5th Cir. 2020). And, in later cases, the Fifth Circuit cited *Emerson*'s historical analysis — along with its conclusion that "legislative prohibitions on the ownership of firearms by felons are not considered infringements on the historically understood right to bear arms protected by the Second Amendment" — in upholding the constitutionality of Section 922(g)(1). *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003); *see also United States v. Everist*, 368 F.3d 517,

14

519 (5th Cir. 2004) (citing *Emerson* for the conclusion that it "is not inconsistent with the Second Amendment" as historically understood "to limit the ability of convicted felons to keep and possess firearms"). Therefore, even though the Fifth Circuit overruled *Emerson*'s embodiment of means-end scrutiny, its historical analysis was not called into doubt. *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir.), *rev'd on other grounds*, No. 22-915, 2024 WL 3074728 (Jun. 21, 2024).

Moreover, following these decisions, the Supreme Court — performing its own thorough textual and historical analysis — confirmed *Emerson*'s understanding of the Second Amendment as protecting the individual right to keep and bear arms unconnected with military service. *Heller*, 554 U.S. at 577–628. Despite noting that its historical analysis was not "exhaustive," the Court underscored that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons . . . .'") (internal citation omitted); *accord Rahimi*, 2024 WL 3074728, at *10.

Since then, the Fifth Circuit has consistently cited *Heller* in upholding the constitutionality of Section 922(g)(1) and reaffirming its pre-*Heller* decisions. *See, e.g.*, *United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009) (stating that *Heller* "provides no basis for reconsidering" precedent upholding Section 922(g)(1) and, in fact, reinforces the lawfulness of "longstanding prohibitions on the possession of firearms by felons"); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("Dicta in *Heller* states that the opinion should not be taken to cast doubt on long-standing prohibitions on possession of firearms by felons, and we have reaffirmed our prior jurisprudence on this point since *Heller* was decided.") (internal marks omitted).

It was only "[p]ost-*Heller*" that the Fifth Circuit — following its sister circuits — "adopted a two-step inquiry" for analyzing restrictions of Second Amendment rights. *McGinnis*, 956 F.3d at 753 (quoting *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016)). Analyzing a different subsection of 18 U.S.C. Section 922, the Fifth Circuit preserved at step one the determination of whether a challenged law "harmonizes with the historical traditions associated with the Second Amendment guarantee"; however, it introduced a second step: application of "means-ends scrutiny." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194–95 (5th Cir. 2012) (citing *Heller*, 554 U.S. at 577–628)). The court did not challenge *Heller*'s recognition of "presumptively lawful regulatory measure[s]" — such as the prohibition of firearm possession by felons — but instead noted that such regulations "would likely be upheld at step one of [the] framework." *Id.* at 196. Following *National Rifle Association*, the Fifth Circuit never applied this new framework in the context of Section 922(g)(1) but instead held — reiterating *Heller*'s preservation of "longstanding prohibitions on the possession of firearms by felons" — that the "rule of orderliness d[id] not permit [it] to revisit [its previous] holdings" upholding the statute. *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017).

Then came *Bruen*. As acknowledged by the Fifth Circuit, *Bruen* "fundamentally change[d]" the Second Amendment analysis by rejecting the addition of means-end scrutiny as a second step. *Rahimi*, 61 F.4th at 450, *rev'd on other grounds*, No. 22-915, 2024 WL 3074728 (Jun. 21, 2024). The *Bruen* Court reasoned that, contrary to the circuit courts' interpretation of its precedent, "*Heller* d[id] not support" this additional step in the analysis. *Id.* Importantly, though, "consistent with *Heller*," the *Bruen* Court expressly preserved the first step — "a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19–20. Notably, at this

step, the line of precedent extending from *Emerson* to *Massey* upheld Section 922(g)(1) as consistent with the Second Amendment as historically understood.

In any event, and regardless of the remaining viability of Fifth Circuit case law pre-*Bruen*, its post-*Bruen* precedent reaches the same conclusion. In *Rahimi*, the Fifth Circuit reaffirmed the constitutionality of "longstanding prohibition[s] on the possession of firearms" by felons, as originally recognized in *Heller*. *Rahimi*, 61 F.4th at 452, *rev'd on other grounds*, 2024 WL 3074728 (Jun. 21, 2024) (quoting *Heller*, 554 U.S. at 626–27).

In considering whether the statute prohibiting possession of firearms by someone subject to a domestic violence restraining order violated the Second Amendment, the court rejected the government's argument that the amendment applied only to "ordinary, law-abiding citizens," as stated in *Bruen*. *Id.* at 451–52. The court construed *Bruen*'s reference to "ordinary, law-abiding citizens" — and *Heller*'s similar reference in discussing the amendment's scope — as "shorthand in explaining that its holding . . . should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Id.* at 452 (quoting *Heller*, 554 U.S. at 626–27, and explaining that "*Bruen*'s reference . . . is no different"). These references were "meant to exclude from the [c]ourt's discussion groups that have historically been stripped of their Second Amendment rights, *i.e.*, groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Id.* Because Rahimi did not fall into any such group, he enjoyed the "strong presumption" that he remained within "the people" protected by the Second Amendment: "[W]hile he was suspected of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him." *Id.* (quoting *Heller*, 554 U.S. at 626–27).

Likewise, in *United States v. Daniels*, the Fifth Circuit again distinguished "felons" as "people who were historically stripped of their Second Amendment rights" and determined that the defendant in that case presumptively held Second Amendment rights because he was "not a felon or mentally ill." 77 F.4th 337, 343 (5th Cir. 2023) (quotation omitted). Thus, even post-*Bruen*, the Fifth Circuit continues to interpret Supreme Court precedent as permitting the prohibition of firearm possession by felons. *E.g.*, *Rahimi*, 61 F.4th at 452, *rev'd on other grounds*, No. 22-915, 2024 WL 3074728 (Jun. 21, 2024); *see also id.* at 464 ("The Supreme Court has also made clear that our Nation's history and traditions include 'longstanding prohibitions on the possession of firearms by felons' — and that such measures are 'presumptively lawful.'") (Ho, J., concurring) (quoting *Heller*, 554 U.S. at 626 n.26).

Because the changes advanced in *Bruen* did not implicate the basis on which the Fifth Circuit held Section 922(g)(1) to be constitutional, and *Rahimi*'s express, post-*Bruen* affirmation of the constitutionality of "longstanding" felon-in-possession laws, district courts in the Fifth Circuit have properly declined to reconsider the constitutionality of Section 922(g)(1). *See, e.g.*, *United States v. Thompson*, No. CR 22-173, 2023 WL 3159617, at *4 (E.D. La. Apr. 27, 2023) ("*Rahimi* recognizes, as did the Supreme Court in *Heller* and *McDonald*, that the history and tradition of the Second Amendment make clear that prohibiting convicted felons from possessing firearms is constitutionally tolerable."); *United States v. Mosley*, No. 4:23-CR-0041-P, 2023 WL 2777473, at *2 (N.D. Tex. Apr. 4, 2023) ("[T]he Fifth Circuit has held that restrictions prohibiting convicted felons from possessing firearms do not violate the Second Amendment . . . . *Bruen* did not change that fundamental premise."); *United States v. Clay*, No. 6:22-CR-00086, 2023 WL 3059155, at *2 (S.D. Tex. Apr. 23, 2023) ("[T]he Court has reviewed cases that both pre- and post-date *Bruen* and finds that *Bruen* does not render Section 922(g)(1) unconstitutional.").

In fact, since *Bruen*, almost "[a]ll district courts within the Fifth Circuit have . . . rejected" constitutional challenges to Section 922(g)(1) under the Second Amendment. *United States v. Isaac*, No. SA-22-CR-0037-XR, 2023 WL 2467886, at \*1 (W.D. Tex. Mar. 9, 2023); *but see United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at \*34 (S.D. Miss. June 28, 2023) (granting a motion to dismiss a Section 922(g)(1) indictment based on an as-applied challenge).

The Court agrees with the near-unanimous conclusion of courts in this circuit and concludes that it is bound by precedent upholding Section 922(g)(1). The issue is foreclosed by Fifth Circuit precedent "absent an intervening change in the law" that "unequivocally overrule[s]" it. *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023); *Team Contractors, L.L.C. v. Waypoint Nola, L.L.C.*, 976 F.3d 509, 518 (5th Cir. 2020) ("Under this circuit's rule of orderliness, each panel deciding an appeal is bound by Fifth Circuit precedents (as district courts surely are for other reasons)."). Far from unequivocally overruling Fifth Circuit precedent, *Bruen* eliminated a *step* of the Second Amendment analysis — means-end scrutiny — that the Fifth Circuit only applied "sub silentio" when upholding Section 922(g)(1). *McGinnis*, 956 F.3d at 755. In contrast, the Fifth Circuit expressly considered the Second Amendment as historically understood, concluding that it does not — and was not intended to — protect convicted felons. *Emerson*, 270 F.3d at 261; *Darrington*, 351 F.3d at 634. The Supreme Court reaffirmed this conclusion when it preserved the "longstanding prohibitions" on firearm possession by felons. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. And the Fifth Circuit thereafter expressly adopted the Supreme Court's preservation of such prohibitions. *Anderson*, 559 F.3d at 352 n.6; *Scroggins*, 599 F.3d at 451; *Massey*, 849 F.3d at 265. Finally, *Bruen* kept intact the *Heller* precedent — which the Fifth Circuit repeatedly, expressly cited when upholding Section 922(g)(1),

and which preceded its imposition of a two-step analysis. *Bruen*, 597 U.S. at 32. And, if any uncertainty remained, the Fifth Circuit confirmed following *Bruen* that felon-in-possession restrictions are historically supported and presumptively lawful. *Rahimi*, 61 F.4th at 452, *rev'd on other grounds*, No. 22-915, 2024 WL 3074728 (Jun. 21, 2024); *Daniels*, 77 F.4th at 343; *see also Rahimi*, 2024 WL 3074728, at *10.

Even if *Bruen* constituted an intervening change in the law, the Fifth Circuit has indicated that a district court "correctly f[inds] itself bound by" Fifth Circuit precedent — even in the face of a subsequent Supreme Court decision that appears to "implicitly overrule" that precedent — until the Fifth Circuit "determine[s] that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021); *see also Thompson*, 2023 WL 3159617, at *4 ("[T]he authority to determine whether the Fifth Circuit's pre-*Bruen* precedent regarding the constitutionality of [Section] 922(g)(1) has been overturned by an intervening change in the law lies with the Fifth Circuit alone."); *United States v. Jordan*, No. EP-22-CR-01140-DCG-1, 2023 WL 157789, at *7 (W.D. Tex. Jan. 11, 2023) ("[T]he Fifth Circuit's opinion in *Bonvillian* indicates that [d]istrict [c]ourts have no power to declare that an intervening Supreme Court case inters an otherwise-binding Fifth Circuit case."). Therefore, in accordance with controlling Fifth Circuit precedent, the Court concludes that Section 922(g)(1) is constitutional under the Second Amendment.

**CONCLUSION**

Because Nevarez is not among "the people" who hold Second Amendment rights, Fifth Circuit precedent expressly forecloses his attacks on the constitutionality of Section 922(g)(1), and the Supreme Court's holding in *Bruen* did not unequivocally overrule that precedent, the Court **DENIES** the motion.

**SO ORDERED**.

July __17__, 2024

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE